{¶ 1} Appellants, Rebecca Cook and Mario Botello, appeal a decision of the Seneca County Common Pleas Court, Juvenile Division, awarding permanent custody of their minor child, Feliciah Cook, to appellee, Seneca County Child Department of Job and Family Services ("SCFS"). On appeal, Cook and Botello argue that SCFS failed to present sufficient evidence as to the elements necessary for an award of permanent custody and that the decision was against the manifest weight of the evidence. Upon review of the record, we find that sufficient competent, credible evidence was presented as to the need for permanent commitment of this child to the state and, therefore, affirm the judgment of the trial court.
 {¶ 2} Facts and procedural posture pertinent to issues raised on appeal are as follows: On April 8, 2002, Rebecca Cook gave birth to Feliciah Cook. Mario Botello claimed to be the child's father and Cook, although having initially indicated that another man could have fathered the child, later testified that Botello was Felicia's natural father. Felicia is Cook's fourth child, Botello's fifth child, and the third between the couple.
 {¶ 3} Cook was pregnant with Felicia by July or August 2001. At that time, another child of the couple, Saliah Cook, born March 3, 2000, had been in the temporary custody of SCFS for more than fifteen consecutive months with neither parent making significant progress toward the case plan. The couple thereafter concealed Cook's pregnancy from Saliah's caseworkers and other counselors until shortly before her birth.
 {¶ 4} In addition, permanent custody of Zachary Cook, another child of the couple, born November 21, 1998, had been awarded to Franklin County Department of Job and Family Services ("FCFS"). Zachary had initially been taken into custody for a series of unexplained injuries requiring medical attention, including adult human bites to his cheek, suspicious burns, and a skull fracture. Furthermore, Cook's parental rights to another sibling, Ariana Cook, born March 23, 1996, had been involuntarily terminated and permanent custody awarded to Hancock County Department of Job and Family Services.[1]
 {¶ 5} Permanent custody hearings for Saliah began April 8, 2002, but were suspended the following day when it was reported that Cook had given birth to Feliciah. The couple had originally planned to deliver Feliciah at a hospital in Seneca County. However, when SCFS discovered her delivery plans, the couple attempted to hide the birth by going to an unscheduled hospital in Wyandot County. Feliciah was taken into emergency protective custody the following day.
 {¶ 6} When permanent custody hearings for Saliah reconvened, SCFS moved to join Feliciah to the ongoing custody action. Although Saliah's case plan was amended to include Feliciah, the court elected to proceed separately with and independently review the permanent custody motions. The permanent custody hearings for Saliah continued on May 24 and 25, 2002, and were concluded June 13 and 19, 2002. On June 21, 2002, the trial court awarded permanent custody of Saliah to SCFS.
 {¶ 7} The motion for permanent custody of Feliciah came on for hearing on June 26, 2002. By agreement of the parties, Feliciah was found to be a dependent child, pursuant to R.C. 2151.04(A) and (D), and SCFS was relieved from making reasonable reunification efforts due to the involuntary terminations of Cook and Botello's parental rights to Zachary and Saliah Cook, and Cook's rights to Ariana Cook.[2] During the hearing, Cook and Botello stated their desire to voluntarily surrender their parental rights to Feliciah. The court scheduled surrender proceedings for July 1, 2002. At the hearing, the couple reported that they had changed their minds regarding the surrender. The court then proceeded with the permanent custody hearing, focusing its inquiry on the events that transpired after February 16, 2001. Upon review of the evidence presented, the trial court awarded permanent custody of Feliciah to SCFS on July 5, 2002. Cook and Botello perfected separate appeals from this determination, each presenting a single assignment of error for our review.
Cook's Assignment of Error:
 {¶ 8} "The Trial Court committed reversible error in granting permanent custody to the Seneca County Department of Job and Family Services which is against the manifest weight of the evidence presented."
Botello's Assignment of Error:
 {¶ 9} "The Trial Court erred and abused its discretion in granting the Motion for Permanent Custody filed by the Seneca County Department of Job and Family Services, because the evidence presented failed to meet the burden of proof placed on the Agency, of clear and convincing evidence, as to the required elements for a termination of parental rights under O.R.C. 2151.414."
 Reasonable Efforts of SCFS {¶ 10} Within their respective assignments of error, Cook and Botello assert that SCFS failed to make reasonable efforts toward or provide assistance with their attempts at reunification and argue that the trial court abused its discretion when it granted permanent custody of Feliciah to SCFS in light of evidence regarding communication difficulties with caseworkers during Saliah's custody action. Botello argues that the lack of reference to these shortcomings illustrates that the court acted arbitrarily and unconscionably by failing to afford due consideration to matters which he claims were beyond their control.
 {¶ 11} As an initial matter, we note that appellate courts must adhere to "every reasonable presumption in favor of the lower court's judgment and finding of facts."[3] "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony."[4] Judgments supported by competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.[5]
 {¶ 12} Although an agency with temporary custody of a child generally bears a duty to employ diligent efforts toward family reunification, agencies may be relieved of that duty under several circumstances, and a determination as to whether the agency made reasonable efforts is not necessary for an award of permanent custody pursuant to R.C. 2151.414.[6]
Where, as here, a parent from whom a child was removed has had parental rights involuntarily terminated with respect to a sibling of the child, R.C. 2151.419(A)(2) directs that "[t]he court shall make a determination [at any hearing held pursuant to sections 2151.28, 2151.31(E), 2151.314,2151.33, or 2151.353 of the Revised Code at which the court removes the child from the child's home or continues the removal of the child from the child's home] that the agency is not required to make reasonable efforts to * * * eliminate the continued removal of the child from the child's home [or] return the child to the child's home."[7] Moreover, R.C. 2151.413(C) specifically mandates that "[t]he court shall not deny an agency's motion for permanent custody solely because the agency failed to implement any particular aspect of the case plan."
 {¶ 13} Although the terminations of Cook's parental rights to Ariana Cook and Cook and Botello's rights to Zachary Cook relieved SCFS from making reasonable reunification efforts, the trial court continued to review and repeatedly approved SCFS's efforts throughout Saliah's proceedings. When the court awarded permanent custody of Saliah to SCFS, it again determined that the agency had made reasonable efforts toward reunification as required by law and proceeded to outline the attempts of several caseworkers and counselors to assist Cook and Botello in satisfying case plan requirements. The parties do not challenge the subsequent determination that SCFS was relieved from making reasonable reunification efforts with Feliciah after permanent custody of Saliah was awarded to SCFS.
 {¶ 14} A majority of the purported shortcomings were related to phone calls Cook made in the summer or fall of 2001 that were not returned by SCFS. However, as discussed below, Cook was residing in Indiana at the time and had failed to attend several scheduled visitations. Furthermore, SCFS caseworkers identified significant periods wherein the parents would not contact the agency and testified that Botello refused to provide his address or phone number, that they returned nearly all phone calls, and that repeated follow-up calls were made when a parent requested visitation or other assistance. Upon review of the record, we find no evidence that the trial court acted arbitrarily or unconscionably and find that the record contains competent, credible evidence supporting the trial court's determinations.
 Sufficiency and Manifest Weight {¶ 15} A parent's right to raise his or her child is an "essential" and "basic civil right."[8] Parents have a "fundamental liberty interest" in the care, custody, and management of their children.[9] The rights and interests of a natural parent are not, however, absolute: where a court finds that permanent custody is appropriate under circumstances of a particular case and all due process safeguards have been followed, whatever residual rights a parent may have are properly divested.[10]
Decisions concerning child custody matters lie within the sound discretion of the trial court and will not be reversed unless the trial court abused its discretion.[11] An abuse of discretion occurs when a court renders a decision that is arbitrary, unreasonable or unconscionable.[12]
 {¶ 16} Because constitutionally protected liberty interests are at stake in a permanent custody proceeding, due process requires the movant to prove that applicable statutory factors have been proved by clear and convincing evidence.[13] Clear and convincing evidence is that measure or degree of proof which is more than a mere preponderance of the evidence, but not to the extent of such certainty as is required beyond a reasonable doubt in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to facts sought to be established.[14] Where the proof required must be clear and convincing, a reviewing court will examine the record to determine whether the trier of fact complied with statutory requirements and whether there was sufficient evidence to support its finding by clear and convincing evidence that one or more statutory factors precluding that child's return to either parent exist.[15]
 {¶ 17} R.C. 2151.413 permits an agency granted temporary custody of a child who is not abandoned or orphaned to move for permanent custody. R.C. 2151.414(B)(1) provides that permanent custody may be granted if the court determines, by clear and convincing evidence, that such action will serve the best interests of the child and that any of the following factors apply: (a) the child is not abandoned or orphaned or has not been in the temporary custody of one or more public services agencies or private child placing agency for twelve or more months of a consecutive twenty-two month period, but cannot be placed with either parent within a reasonable time or should not be placed with either parent; (b) the child is abandoned; (c) the child is orphaned without relatives able to take permanent custody; or (d) the child has been in the temporary custody of one or more public services agencies or private child placing agency for twelve or more months of a consecutive twenty-two month period.
 {¶ 18} The focus of the "best interest" determination is upon the child, not the parent,[16] as R.C. 2151.414(C) specifically prohibits the court from considering the effect a grant of permanent custody would have upon the parents. In determining the best interests of a child, R.C.2151.414(D) provides that "the court shall consider all relevant factors, including, but not limited to, the following: "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999; (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; (5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."
 {¶ 19} R.C. 2151.414(E) provides that if, after considering all relevant evidence, the court determines that one or more of the following factors exist as to each parent, "the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent: (1) Following the placement of the child outside the child's home and notwithstanding the reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have failed continuously and repeatedly to substantially remedy those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties; * * * (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by actions showing an unwillingness to provide an adequate permanent home for the child; * * * (11) The parent has had parental rights involuntarily terminated pursuant to this section or section 2151.353 [2151.35.3] or 2151.415 [2151.41.5] of the Revised Code with respect to a sibling child; * * * (16) Any other factor the court considers relevant."
 {¶ 20} In support of its permanent custody award, the trial court found, pursuant to R.C. 2151.414(B)(1)(a) and R.C. 2151.414(E)(11), that both parents had their parental rights involuntarily terminated with respect to siblings of Feliciah.[17] The court further determined that the parents' conduct evidenced an unwillingness to provide an adequate home and lack of commitment toward the child,[18] concluding that Feliciah could not be placed with either parent within a reasonable period of time.[19] Proceeding to examine the child's best interests, the court held that, pursuant to R.C. 2151.414(D)(1), (2), (3), (4) and (5), clear and convincing evidence supported that a termination of parental rights and award of permanent custody to SCFS was in Feliciah's best interests.
 {¶ 21} In support of its determination, the court found that domestic violence permeated the relationship, significantly impairing their ability to care for Feliciah in a safe and healthy environment. The court regarded their attempts to conceal the child's birth to be reflective of their intention to be non-compliant with efforts to protect the child, thereby placing Feliciah's health and safety at risk. Additionally, the court indicated that their continuous and repeated failure to substantially remedy the conditions causing Felicia to be taken into protective custody demonstrated a lack of commitment to the child. As to Botello, the court cited his failure to maintain steady employment despite being a skilled construction worker, his failure to utilize financial resources to reinstate his driver's license, his failure to maintain stable housing, his continued violent and abusive conduct toward Cook and others, his failure to comply with prior and current reunification plans over a period of years, his failure to make three paternity testing appointments when transportation was provided to him, and his failure to provide any form of support for the care and maintenance of Feliciah. As to Cook, the court cited her failure to maintain stable housing, her election not to complete counseling programs, her inability to recognize the impact domestic violence has upon her safety and the safety of her children, and her repeated failure to comply with previous and current case plans over a period of several years. For the following reasons, we are not convinced that the trial court's findings are unsupported or that the court abused its discretion in granting SCFS's motion for permanent custody.
 {¶ 22} Requirements for reunification, as originally established for Saliah on May 4, 2000, and subsequently amended to include Feliciah, ordered each parent to: (1) attend counseling to address individual issues and comply with all counselor recommendations until satisfactorily discharged; (2) maintain stable employment and stable housing; (3) cooperate with SCFS; (4) attend appropriate parenting classes to address parenting skill deficiencies; and (5) provide medical and child support as previously ordered. In addition, Botello was prohibited from having any contact with Cook, as per a civil protection order she obtained in March 2000, resulting from repeated threats and intimidating conduct. The parents were ordered to submit written reports regarding counseling, visitation, drug testing, and domestic violence to the court.
 {¶ 23} By entry dated February 16, 2001, the trial court determined that, as of November 17, 2000, minimal progress had been made toward case plan requirements. Botello had not completed parenting, domestic violence, or other counseling and had failed to take any steps to support his child. Even though he had intermittent employment in preceding years and was capable of earning a wage, he continued to avoid his responsibility to pay support, provided no medical insurance for his child, and submitted no evidence that he had provided the child any food, clothing, shelter, or other care. Although Cook visited Saliah after the initial removal and had recently initiated some counseling programs, she had failed to complete parenting, domestic violence, or other counseling, had intermittent employment, and had relocated several times. Neither parent had maintained stable employment or a stable, suitable residence or obtained a driver's license. Nevertheless, the court provided the parents continued opportunity to comply with case plan requirements, maintaining temporary custody with SCFS and ordering the completion of case plan requirements before June 1, 2001. The matter was continued for review as of June 19, 2001.
 {¶ 24} Cook's attorney requested a continuance a day before the June 19, 2001 hearing due to a lack of communication with Cook. The motion was denied. Despite proper notification and service, neither parent appeared for the review hearing. Evidence revealed that Cook had moved to Indiana, where she remained from the first part of March 2001, until mid-July 2001. By July or August 2001, Cook was pregnant with Feliciah. Although Botello had submitted a motion for visitation, he failed to attend the hearing in support thereof. He further failed to attend appointments with SCFS, had attended only two of twenty-four domestic violence classes, and had not obtained a satisfactory visitation recommendation from a counseling agency. Despite this lack of effort or commitment, the court continued the matter for review as of December 2001.
 {¶ 25} On December 10, 2001, SCFS again moved for permanent custody, arguing that the child had been in temporary custody in excess of twenty-one months and that the parents had made little or no progress on the case plan. Service on Botello required multiple postings because he withheld his current mailing address and phone number due to an outstanding warrant in the Seneca County Common Pleas Court. As mentioned above, shortly before the motion was to come on for hearing in April 2002, Cook offered to voluntarily surrender her rights to Saliah, but did not complete the process. When SCFS discovered that Cook was pregnant, the couple attempted to conceal the birth by going to an unscheduled hospital in Wyandot County. Feliciah was taken into protective custody on April 9, 2002, and was subsequently found to be a dependent child. On June 26, 2002, SCFS was relieved from making reasonable reunification efforts due to the involuntary terminations of Cook and Botello's parental rights to Zachary and Ariana Cook.[20]
 {¶ 26} The record reflects that Botello has an extensive history of belligerent, aggressive and abusive behavior toward Cook, family services caseworkers, and others. He was convicted of domestic violence in 1999 and aggravated rioting in 2000. He had two civil protection orders obtained against him by family members of his children: one by Cook in 2000, upon allegations of verbal and physical abuse and one by a maternal grandfather of another child in 1995 or 1996, to protect his minor daughter. Botello's mother identified two incidents of violence predating the protection order. In March 2001, Cook provided a history of Botello's abuse to the Open Arms Domestic Shelter, listing: "objects thrown, threatened with physical/sexual abuse, pushed, shoved, grabbed, slapped, name calling, belittlement." She indicated that he was very possessive and overly protective of her, that he constantly yelled at her because of their children, that he frequently accused her of infidelity, that he isolated her from all others except his mother, that he would become violent when she made attempts to leave him, that his behavior would not improve when she returned, and that they could not trust one another.
 {¶ 27} Botello admitted to violating the protection order in contravention of the case plan in a chance sexual encounter, resulting in her subsequent pregnancy. He claimed this was a single incident of contact during the summer of 2001 and refused to provide further details. However, an SCFS caseworker whom he had previously threatened testified that she saw Botello and Cook together at Wal-Mart in March 2002, and once Botello realized she had observed them together, he followed her to various parts of the store. Botello subsequently admitted to having been there in Cook's presence but maintained that it was merely coincidental. An SCFS transportation provider testified that she was fearful of Botello and would not let him visit the children without supervision. SCFS initially discovered that Cook was pregnant the weekend before Feliciah was born when her doctor was contacted after SCFS was notified that a 9-1-1 caller had reported that the couple was engaged in a verbal and physical argument in front of a residence.
 {¶ 28} Cook's former stepfather, Paul Main, testified that the parties' relationship was a constant fight and that they continuously caused trouble for those around them. He reported having witnessed Botello selling marijuana within the preceding year and another occasion in the past four months where Botello had consumed a case of beer in about two hours. He also observed Botello push Cook and call her derogatory names when she was more than eight months pregnant. Main described Botello as excessively controlling and testified that he rejected a majority of the assistance offered to the couple. Main offered Cook a stable residence in Fostoria, Ohio, but she declined upon Botello's refusal.
 {¶ 29} In addition, Botello threatened SCFS caseworkers with physical violence in relation to Zachary Cook's case plan and exhibited threatening behavior toward an SCFS caseworker, who felt it necessary to file a complaint with the Sheriff's Department. An SCFS transportation provider reported that Botello made repeated phone calls to Cook during a recent visitation, demanding that she remove her belongings from their then-current residence. During a June 26, 2002 interview with an adoption assessor, Botello attempted to intimidate and verbally accosted the assessor. A deputy sheriff was summoned to calm Botello so that the interview process could proceed. The transcript of the proceedings supports that he was evasive, non-responsive, and confrontational with the court and counsel. Both court and counsel had to instruct Botello to sit down on the chair in the witness stand because he was becoming turbulent and disrupting the proceedings. The court expressly found that Botello was not forthright and that his testimony lacked credibility.
 {¶ 30} As of July 3, 2002, Botello owed more than four thousand dollars in child support arrearages. Although he lived with his family and paid no rent or utilities, he failed to provide any significant support for Feliciah. Millwood Industries, a previous employer, terminated Botello in December 2000, for excessive absenteeism, aggressive behavior, poor attitude, and for filing an unsubstantiated complaint with OSHA that halted production for two weeks. Over the next eighteen months, Botello worked sporadically for his brother's construction company while continuing to draw unemployment. Although aware of a construction boom in Findlay and skilled in masonry, electrical, framing, and other construction labor for which individuals are paid between twenty-three and thirty-one dollars per hour, Botello admitted that he had not taken steps to be certified as to any of these skills and claimed that his brother only paid him six dollars per hour. Within the week preceding the final hearings, Botello had obtained a job with Competitive Brakes in Port Clinton, Ohio. However, he had yet to receive a paycheck and provided no evidence as to whether health insurance was available or had been obtained for his daughter. Botello claimed that his failure to financially support his children was not neglect because welfare could support a family and others were doing the same.
 {¶ 31} Although aware of the case plan requirements for Saliah and that the case plan had been amended to include Feliciah, Botello failed to attempt to fulfill minimal case plan requirements, much less make reasonable efforts to obtain visitation with his daughters, after more than two years of opportunity. He failed to obtain a counselor recommendation that he was suitable for visitation and failed to appear for a hearing in support of a motion for visitation. Although he claimed to be Feliciah's father, he had not taken steps to formally acknowledge his paternity and missed paternity testing appointments even though SCFS provided transportation vouchers. Botello testified that he did not make the appointments because he had more important things to do than establish paternity of Feliciah. He finally submitted to testing the day before the June 26, 2002 adjudicatory hearing but subsequently offered to surrender his parental rights.
 {¶ 32} Between February 2001, and the final adjudicatory hearings, Cook held not less than eight different jobs in five cities and two states. She was periodically unemployed, worked less than full time, was inconsistent with wage withholding for child support, and continued to work for employers who did not offer medical or other benefits. She was placed on probation for arguing with a coworker while employed by Upfront Construction and subsequently quit. She later obtained a job at Taco Bell, where she continued to work an average of thirty-two to thirty-five hours per week, and medical benefits were unavailable. Laura Krause, a child support caseworker for the Department of Human Services, testified that her office had recently been notified that Cook had been terminated from Taco Bell in Fostoria, effective March 12, 2002. Cook claimed that Taco Bell had lied and that she had been laid off as opposed to fired. She was then hired by Taco Bell in Fremont and fired the following day for unexplained corporate policy reasons. On the second day of the final hearings, she reported that she had obtained a job as a second-shift cashier at a Friendship-Sunoco gas station. However, she had only attended orientation the preceding day and medical benefits remained unavailable.
 {¶ 33} Throughout the proceedings, the couple remained dependent upon and resided with relatives or friends in locations that had not been approved by caseworkers or were found to be unfit for their children. Since February 2001, Cook had resided at eight different locations, including two locations in Brownsburg, Indiana and four cities in Ohio. Since Feliciah's birth, she had lived in two different residences, neither of which were approved for children. Botello was essentially transient and often concealed his address and phone number to avoid further, unrelated legal proceedings. Since December 2001, he had lived at three separate residences. The couple moved from a residence in May 2002, due to a verbal and physical altercation between Botello and another resident's brother in front of other children, including a three-year-old. One witness testified that the children pleaded with Botello not to fight.
 {¶ 34} Cook had once been approved for income-based housing but lost her qualification when she failed to come up with an initial deposit. Although the couple had since been approved for assistance with a single bedroom apartment, they demanded a two-bedroom apartment for which they could not qualify, resulting in continued housing voucher denials. At the time of the final hearings, the couple was living with Botello's parents in Fremont, Ohio. Relative placement with his parents had been explored by SCFS but was denied due to prior domestic violence issues between the couple and their two-year failure to acquire a satisfactory fire safety inspection.
 {¶ 35} In January 2001, Cook offered to surrender her parental rights to Saliah to SCFS and went so far as to execute documents that would facilitate adoption. Without notice to the court, Cook moved to Brownsburg, Indiana on March 17, 2001, and remained there without visiting Saliah until July 2001. After a July 12, 2001 visitation, Cook did not visit Saliah until December 2001. When SCFS moved for permanent custody of Saliah on December 10, 2001, the frequency and consistency of Cook's visits improved. However, she remained dependent upon SCFS for transportation and had four cancellations in the following four months, two of which were unexplained. In addition, an SCFS transportation provider waited approximately fifteen minutes while Cook refused to come out of a residence for an April 2002 visitation, despite another resident's attempts to convince her to attend the visitation. She also contacted SCFS on April 6, 2002, to surrender her parental rights to Saliah, but failed to consummate the surrender. Finally, Cook contacted a caseworker in June 2002, requesting that she have the foster mother provide money for a visitation because she could not afford to purchase fast-food meals for herself and the children. Although Cook had recently obtained a learner's permit for a driver's license, she had been dependent upon SCFS transportation services for visitation for more than two years because she had not paid a $151.00 traffic fine received four years earlier.
 {¶ 36} The record further evidences that Cook and Botello were unable to successfully complete counseling. Cook claimed to have attended counseling in Indiana but failed to produce material verifying her attendance. When she signed a release of information form and the listed counseling providers were contacted, both locations reported that they had no record of her. Barbara Banecheck, a Firelands Community Hospital employee, provided family counseling for Cook from November 2000, through February 2001. During that period, they met a total of nine times before Cook voluntarily and prematurely left the program. Banecheck testified that Cook was not effective in pursuing reunification goals and was not ready to be released from the program. She found that Cook gravitated toward and remained dependent upon Botello and his family, whom Banecheck identified as negative influences. She stated that Cook had not demonstrated any parenting skills during the nine sessions, needed significant assistance if she hoped to develop any such skills, and had not attained any level of competent independence.
 {¶ 37} Lila Allen, an outpatient counselor at Catholic Charities in Fostoria, outlined services provided to Cook by SCFS as part of the agency's reunification efforts. Cook attended nine appointments between December 2001, and March 2002, but missed four appointments and was required to sign a "last chance" agreement prohibiting any further absences on April 12, 2002. On May 1, 2002, she did not call or appear for a scheduled appointment and was subsequently discharged. Allen testified that the discharge was not related solely to absences, indicating in the discharge letter that it was "evident that Rebecca is not investing herself in the treatment process sufficient to offer a reasonable chance of benefit." During the sessions she did attend, Cook acknowledged that she was mentally and physically abused by Botello, did not consult with or went against counsel recommendations as to the release of the civil protection order against him, concealed her reunion with him, and denied or concealed her pregnancy. She further admitted that she lost a job when she became involved in an altercation with a co-worker. Subsequent investigation revealed that Rebecca was six months pregnant with Feliciah at the time of the altercation. Allen opined that Cook needed additional parenting classes and several weeks of counseling.
 {¶ 38} Michael Cheatham, a licensed social worker and case manager for the First Step Family Violence Intervention Center, counseled both Cook and Botello. He saw Cook for an initial consultation in early 2000. After meeting with her a few times, they had no contact for a period of nine months. Between October 2001, and April 2002, they had only four appointments. Although Cook had since completed a Passages Program, a psycho-educational class on parenting skills, anger management, domestic violence, and conflict resolution, Cheatham testified that her conduct reflected that the program was ineffective and that additional counseling was necessary. Cook claimed that she was still in counseling with Cheatham. Subsequent inquiry revealed that Chetham had only completed an initial assessment, whereby he recommended significant additional counseling and that Cook was not presenting attending counseling.
 {¶ 39} Botello had called but not participated in a drug and alcohol treatment facility and had not completed parenting counseling. Cheatham and counselors at First Step Family Services Center indicated that Botello's conduct evidenced that counseling was ineffective and additional treatment was necessary. Although he had attended an anger management program in March 2001, they would not certify his completion because he refused to pay a seventy-five dollar fee, and there was no evidence as to whether they found the program to be successful.
 {¶ 40} At the time of the final hearing, Patty Devaughn, Saliah's foster mother, had custody of Feliciah since she was a day old and had provided a safe, nurturing, stable, and healthy home for Saliah for more than two years. Devaughn cooperated diligently with the case plan and there is no evidence that she has done anything to impair or delay the execution of the case plan or the parties' efforts towards compliance. During the preceding years, Saliah became accustomed to and bonded with Devaughn, who expressed a desire to adopt both children. SCFS caseworker, Melissa Taggert, testified that Feliciah had also bonded with Devaughn and that a close relationship had formed between Saliah and Feliciah. Taggert testified that Devaughn's home was a safe and healthy environment, and it would be in Feliciah's best interest to remain in the home with Devaughn and her sister.
 {¶ 41} Guardian ad litem, Judith Reiter, testified that she was particularly concerned with the couples' transient lifestyle, lack of stable housing or employment, and inability to complete or apply counseling. Having observed Cook with Saliah and Feliciah, Reiter stated that she appeared to attempt to entertain as opposed to parent or nurture the children. Reiter was exceedingly apprehensive about Botello's history of domestic violence and the manner in which he continued to conduct himself with Cook, counselors, social workers, and court personnel. She testified that the domestic dispute, which precipitated the couple's move in May, illustrates that they are not applying the lessons that they have received from counseling, taking particular note of the fact that the couple perceived the event to be of little significance despite the presence of small children. She further stated that the couple had been presented with liberal opportunities to comply with reunification plan guidelines, indicating that Cook was aware she was pregnant in July 2001, and had failed to follow through with minimal objectives by July 2002. Reiter confirmed that Devaughn provided a nurturing environment and testified that Feliciah neither could nor should be returned to Cook or Botello within a reasonable period of time, concluding that the only way to a stable and permanent home was termination of parental rights. Anne Lang, another guardian ad litem, concurred in the recommendation, testifying that neither parent had demonstrated that they could abide by and complete the case plan within a reasonable time.
 {¶ 42} Upon review of the record, we find that sufficient, competent, credible evidence was presented as to the need for permanent commitment of this child to the State. Over a period of two years, Botello failed to fulfill case plan requirements, much less make reasonable efforts to support or obtain visitation with his daughters. Cook admitted that she remains with Botello against court orders and the recommendations of several counselors, that she had not completed required counseling, that her transience evidenced a lack of commitment, that she has not had stable, full-time employment, and that she still does not have and could not guarantee when she would obtain stable, suitable housing. Having provided repeated opportunities for reunification, the trial court carefully considered and correctly applied all relevant factors as to the child's best interest. We are not willing to force courts to experiment with the health and safety of a newborn child where the State has shown, by clear and convincing evidence, that placing the child into an environment would be threatening to the child's health and safety and that the child cannot placed in that environment within a reasonable period of time.[21] Consequently, because we cannot find that the trial court abused its discretion in deciding to terminate parental rights and grant permanent custody, and that the decision is supported by clear and convincing evidence, we find Cook and Botello's respective assignments of error are without merit.
 {¶ 43} Having found no error prejudicial to the appellants herein, in the particulars assigned and argued, the judgment of the Seneca County Common Pleas Court, Juvenile Division, is hereby affirmed.
Judgment affirmed.
BRYANT, P.J. and SHAW, J., concur.
[1] In re Ariana Cook (Oct. 8, 1998), Hancock App. No. 5-98-16.
[2] R.C. 2151.419(A)(2)(e).
[3] In re Brodbeck (1994), 97 Ohio App.3d 652, 659, quoting Gerijo,Inc. v. Fairfield (1994), 70 Ohio St.3d 223, 226.
[4] Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80; see, also, C.E. Morris Co. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279.
[5] C.E. Morris Co., 54 Ohio St.2d at syllabus.
[6] In re Evans (Oct. 30, 2001), Allen App. No. 1-01-75,2001-Ohio-2302.
[7] R.C. 2151.419(A)(2)(e) (emphasis added).
[8] In re Murray (1990), 52 Ohio St.3d 155, 157; Stanley v. Illinois
(1972), 405 U.S. 645, 651, 92 S.Ct. 1208, 1212-1213, 31 L.Ed.2d 551,558-559.
[9] In re Murray, 52 Ohio St.3d at 157, citing Santosky v. Kramer
(1982), 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-1395, 71 L.Ed.2d 599,606.
[10] In re Palmer (1984), 12 Ohio St.3d 194, 196.
[11] See Miller v. Miller (1988), 37 Ohio St.3d 71, 74.
[12] Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
[13] In re Rodgers (2000), 138 Ohio App.3d 510, 519; R.C. 2151.414.
[14] State v. Schiebel (1990), 55 Ohio St.3d 71, 74.
[15] In re Nicholas H. (2000), 137 Ohio App.3d 442, 448.
[16] In re Wise (1994), 96 Ohio App.3d 619, 624; In re Awkal (1994),95 Ohio App.3d 309, 315.
[17] R.C. 2151.414(B)(1)(a); R.C. 2151.414(E)(11).
[18] R.C. 2151.414(E)(4) and (16).
[19] R.C. 2151.414(B)(1)(a); R.C. 2151.414(E)(4), (11) and (16).
[20] R.C. 2151.419(A)(2)(e).
[21] Cf. In re: Letch (October 21, 2001), Seneca App. No. 13-01-11, 2001-Ohio-2306, quoting In re Campbell, 13 Ohio App.3d 34, syllabus.